# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 157 | **DATE** | 3/6/2003 |
| **CASE TITLE** | MICHELL CARTER vs. RESEARCH INTERNATIONAL USA, INC. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Status hearing held. Enter Memorandum Opinion And Order. Research's motion for summary judgment is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| ✓ | Docketing to mail notices. |
| ✓ | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |
| LG | courtroom deputy's initials |

Document Number: 12

Date docketed: MAR 10 2003

Date/time received in central Clerk's Office

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICHELL CARTER, | ) |
| Plaintiff, | ) ) |
| | ) No. 02 C 0157 |
| v. | ) ) |
| RESEARCH INTERNATIONAL USA, INC., | ) Judge John W. Darrah |
| Defendant. | ) ) |



## MEMORANDUM OPINION AND ORDER

Plaintiff, Michell Carter, ("Carter"), filed suit against Defendant, Research International USA, Inc. ("Research"), alleging retaliation pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* Presently before the Court is Research's Motion for Summary Judgment.

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). All the evidence and the reasonable inferences that may be drawn from the evidence are viewed in the light most favorable to the nonmovant. *Miller v. American Family Mutual Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000). Summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In the instant case, Carter did not file a response to Research's Motion for Summary Judgment and has has not disputed any of Research's statements of material facts. Therefore, all

the material facts averred by Research are deemed admitted. *See Oates v. Discovery Zone*, 116 F.3d 1161, 1167 (7th Cir. 1997); L.R. 56.1(b)(3)(B). Although Carter failed to respond to Research's statement of material facts and such facts are deemed admitted, Research's Motion for Summary Judgment will only be granted if Research can demonstrate that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Johnson v. Gudmundson*, 35 F.3d 1104, 1112 (7th Cir. 1994).

Research is a full service, international marketing research company that offers a wide range of services to clients in the consumer and business-to-business markets. (Def.'s 56.1(a)(3) Statement ¶ 4). One of the services that Research provides is telephone market research surveys regarding its clients' products. (*Id.* ¶ 5). Research operates a Call Center in Chicago where Telephone Interviewers conduct surveys. (*Id.* ¶ 6).

The primary duty of a Telephone Interviewer is to conduct telephone market research surveys. (Def.'s 56.1(a)(3) Statement ¶ 16). A computer automatically dials a phone number to reach potential survey respondents. When someone answers a call, the telephone interviewer reads survey questions about the client's products from a computer screen and enters the respondents answers. (*Id.* ¶ 17). The Telephone Interviewers sit in cubicles that have adjoining cubicles on either side. (*Id.* ¶ 18). Telephone Interviewers are not allowed to talk to co-workers while on the call floor when they are not conducting an interview to assure that respondents on calls with other telephone Interviewers do not hear casual conversation between Telephone Interviewers in nearby cubicles. (*Id.* ¶¶ 19-20).

Research monitors Telephone Interviewers in order to ensure that they conduct the surveys according to Research's standards. (Def.'s 56.1(a)(3) Statement ¶ 29). Research selects some

telephone Interviewers to monitor other Telephone Interviewers while they conduct surveys. These employees monitor the surveys by tapping into the Telephone Interviewers' phone lines, unbeknownst to the Telephone Interviewer conducting the survey. (*Id.* ¶ 30). The monitor listens for whether the Telephone Interviewer follows the interviewing guidelines, uses proper telephone etiquette, and reads survey questions verbatim. (*Id.* ¶ 31). As they listen to the survey, the monitors rate the Telephone Interviewer by completing a Monitoring Evaluation ("Evaluation") form. (*Id.* ¶ 32). The monitors are not the Telephone Interviewer's supervisors. (*Id.* ¶ 33).

During Carter's employment at Research, Tom Paul ("Paul") was the Director of the Call Center. (Def.'s 56.1(a)(3) Statement ¶ 9). As Director, Paul supervised employees including the Administrative Supervisor, Shift Operating Supervisor, TeleServices Assistants, and Telephone Interviewers. (*Id.* ¶ 10). During this time, Tom Paxton ("Paxton") was the Administrative Supervisor. His responsibilities included hiring employees, maintaining personnel records, and processing the paperwork when an employee was terminated. (*Id.* ¶ 11). Paxton did not have the responsibility for investigating employee complaints, disciplining employees, or making the decision to terminate employees in cases of misconduct. (*Id.* ¶ 12).

At the time of Carter's employment, Arnell McClear ("McClear") and Rick Shaheen ("Shaheen") were Shift Operating Supervisors. (Def.'s 56.1(a)(3) Statement ¶ 13). Their duties included ensuring that Telephone Interviewers were properly monitored while they conducted market research surveys and investigating employee complaints. (*Id.* ¶ 14). McClear and Shaheen supervised TeleServices Assistants, also known as Bay Supervisors, who directly supervised the Telephone Interviewers. (*Id.* ¶ 15).

Carter was hired as a Telephone Interviewer on April 17, 2001. (Def.'s 56.1(a)(3) Statement

¶ 21). On that date, Carter acknowledged her receipt of Research's Standards of Merit ("SOM"). (Id. ¶ 22). In an orientation session, the Research trainer read through the SOM with Carter and other new hires. (Id. ¶ 23). Carter was aware of the contents of the SOM. (Id. ¶ 24).

The SOM prescribes rules on the length and frequency of breaks and includes a dress code. (Def.'s 56.1(a)(3) Statement ¶ 25). The SOM provides that failure to adhere to Research's break policy may result in termination. (Id. ¶ 26). The SOM also contains Research's policy against harassment. The policy states, in pertinent part, that no adverse action will be taken against an employee who reports violations of the policy and participates in the investigation of such violations. Any employee who feels that she is the victim of harassment was to immediately report the matter to the Telephone Central Manager or the Telephone Center Director. (Id. ¶ 27). Carter received a copy of the harassment policy at her orientation. (Id. ¶ 28).

On May 31, 2001, TeleServices Assistant Natalie Navarro ("Navarro") monitored Carter. (Def.'s 56.1(a)(3) Statement ¶ 34). Carter received 43 out of 67 available points, a score of 64%. (Id. ¶ 35). When Navarro completed the Evaluation, she placed it on top of some papers in Carter's cubicle. (Id. ¶ 36). Later, when Navarro asked Carter what happened to the Evaluation, Carter responded that she had not seen the Evaluation. (Id. ¶ 37). Navarro found the torn up Evaluation in the garbage and taped it back together. (Id. ¶ 38).

Navarro brought the Evaluation to McClear and told him where she had found it. (Def.'s 56.1(a)(3) Statement ¶ 39). On the next day that Carter worked, she met with McClear and the Office Manager, Jason Thurwanger, to discuss the Evaluation. (Id. ¶ 40). McClear asked Carter if she intentionally had torn up the Evaluation. (Id. ¶ 41). Caret denied intentionally tearing up the Evaluation. (Id. ¶ 42). Carter stated that when she returned to her cubicle, she threw out the

Evaluation, along with other papers, in the process of cleaning her desk. (*Id.* ¶ 44). Carter also stated that when Navarro asked Carter what happened to the Evaluation, Carter responded that she had not seen the Evaluation. (*Id.* ¶ 45). McClear informed Carter that if he thought that she had intentionally torn up the Evaluation, he would have to terminate her employment. (*Id.* ¶ 47).

Research maintains an Infraction Log for each employee. It uses the Infraction Log to document when an employee violates company policy. (Def.'s 56.1(a)(3) Statement ¶ 48). Beginning in June 2001, Carter's supervisors documented Carter's abuse of Research's break policy as established in the SOM in Carter's Infraction Log. (*Id.* ¶ 49). Twice on June 17, 2001, TeleServices Assistant Tanika Blackledge documented that Carter took several extended breaks before and after her regular break time. (*Id.* ¶ 50).

On July 8, 19, and 23, 2001, TeleServices Assistant Heather Stepp ("Stepp") documented that Cater took excessive and extended breaks. (Def.'s 56.1(a)(3) ¶ 51). The July 19 entry in Carter's Infraction Log states that when Stepp spoke with Carter about taking a 15 minute break after her lunch break, Carter replied that she did not care and that she should have taken a 30 minute break. (*Id.* ¶ 52). On July 28, 2001, Senior Supervisor Antoinette Hudson ("Hudson") documented that Carter's attire violated Research's dress code and that Carter was sent home early because of the violation. (*Id.* ¶ 54). Hudson noted in the Infraction Log that Carter responded in an insubordinate manner. She also e-mailed her report to Shaheen. (*Id.* ¶ 55). Navarro and TeleServices Assistant August Robinson also reported to McClear that on other occasions Carter took excessive and extended breaks. (*Id.* ¶ 53).

Shaheen sent an e-mail to Paxton, McClear, and Paul, expressing his concern that Carter had established a pattern of insubordinate behavior and recommending that Carter's employment be

terminated. (Def's 56.1(a)(3) Statement ¶ 56). On July 29, 2001, Carter clocked-in and began working before Research had an opportunity to speak with her and terminate her employment. (*Id.* ¶ 57). Because Carter had clocked-in and began working on July 29, Research decided that it would be inappropriate to fire her for her conduct on July 28, 2001. (*Id.* ¶ 58). On July 30, 2001, Paul instructed Shaheen and McClear to terminate Carter the next time she committed an infraction. (*Id.* ¶ 60).

Also in July 2001, Carter reported to TeleServices Assistant Candace Watkins ("Watkins") an alleged incident between Carter and another Telephone Interviewer, Cynthia Redd ("Redd"). Carter reported that Redd approached Carter on a Saturday in July 2001 and stated to her "Michell, I really need to talk to you". Redd asked Carter "Why didn't you get enough [food] for me", and placed her hand on Carter's thigh. Carter told Redd to leave her alone and that Redd was making her feel uncomfortable. Carter told Redd, "You're not supposed to do that; that's not right." (Def.'s 56.1(a)(3) Statement ¶¶ 61-62).

On August 2, 2001, Watkins e-mailed a report of Carter's complaint to Paul, McClear, and Shaheen. (Def.'s 56.1(a)(3) Statement ¶ 63). Paul responded by e-mail the next day and instructed McClear and Shaheen to investigate the allegations by speaking with Redd. (*Id.* ¶ 64). Paul instructed McClear and Shaheen that if they determined that Carter's complaint was well-founded, they should note it in Redd's Infraction Log, inform her that the company considered the conduct to be sexual harassment, and send Redd home. (*Id.* ¶ 65).

On Carter's next day at work, McClear met with Carter in his office and questioned her about the incident. (Def.'s 56.1(a)(3) Statement ¶ 66). Carter informed McClear what had happened, and McClear told her that he would deal with Redd. (*Id.* ¶ 67). After her meeting with McClear, Carter

observed Redd go into McClear's office. (*Id.* ¶ 68). When McClear spoke with Redd on August 3, Redd denied engaging in any improper conduct. (*Id.* ¶ 69). McClear reminded Redd of Research's policy against sexual harassment and told her not to engage in any such conduct. (Id. ¶ 70).

Approximately a week after Carter's and Redd's encounter in the break room, Redd approached Carter, tried to grab her arm to get her attention, and told Carter that she needed to speak with her. (Def.'s 56.1(a)(3) Statement ¶ 71). Redd asked Carter why she had spoken with McClear and told her that McClear had told Redd that Carter felt she was being sexually harassed. She also stated that McClear stated that he would not tolerate any harassment and that Redd should stop engaging in such conduct. (*Id.* ¶ 72). Carter told Redd that she was violating Carter "as a person and she was making [Carter] feel uncomfortable with [herself] and what she's doing is called sexual harassment and Carter will file charges against her through the company." (*Id.* ¶ 73). Carter reported the second incident to McClear. (*Id.* ¶ 74). McClear informed Carter that he would deal with Redd. (*Id.* ¶ 76).

Carter also claims that Redd made another comment to her while they were on the call room floor. (Def.'s 56.1(a)(3) Statement ¶ 76). Carter does not recall what Redd allegedly stated, but she reported it to Navarro. (*Id.* ¶ 77). According to Carter, she and Navarro went to McClear's office, where, with Robinson also present, Carter reported to McClear that Redd continued to make passes at her and that she felt that she was being sexually harassed. (*Id.* ¶ 78).

Carter called Paxton the morning after her meeting with McClear. (Def.'s 56.1(a)(3) Statement ¶ 79). Carter told Paxton about Redd touching her thigh, that Redd had approached her on several occasions, and about her most recent meeting with McClear. (*Id.* ¶ 80). Paxton advised Carter to contact Paul regarding her concerns. (*Id.* ¶ 81).

7

On August 9 or 10, 2001, Carter contacted Paul and repeated the allegations she made to Paxton. (Def.'s 56.1(a)(3) Statement ¶ 82). After Carter spoke with Paul, Carter had no further problems with Redd. (*Id.* ¶ 83). Paul had removed Redd from her monitoring responsibilities which resulted in Redd not having any direct contact with Carter. (*Id.* ¶¶ 84-85).

Over the weekend of August 4 and 5, 2001, Watkins informed McClear that female employees complained that Carter repeatedly made inappropriate sexual comments while on the call floor when Telephone Interviewers were conducting surveys, in the break room, and in other places on company property. (Def.'s 56.1(a)(3) Statement ¶ 86). McClear also heard rumors that Carter was dating McClear and receiving preferential treatment. (*Id.* ¶ 87). McClear had heard that Carter had stated "Arnell is my man" and "I'm not going to get fired." (*Id.* ¶ 89). McClear and Carter had never dated. (*Id.* ¶ 88).

During the week of August 6, 2001, TeleServices Assistant James Swain ("Swain") told McClear that Carter had been spreading rumors about a sexual relationship between Carter and Swain and had been doing so on the calling floor while other Telephone Interviewers were speaking with survey respondents. (Def.'s 56.1(a)(3) Statement ¶ 91). McClear also learned from Swain that Carter had spread rumors that Carter and McClear were dating and that Carter received preferential treatment from McClear. (*Id.* ¶ 92).

On August 19, 2001, McClear told Carter to stop spreading rumors and talking on the call floor. (Def.'s 56.1(a)(3) Statement ¶ 93). That same day, Navarro and Robinson brought Carter to McClear's office. They informed McClear that Carter was being disruptive on the calling floor, was not dialing consistently, and was taking excessive restroom breaks. (*Id.* ¶ 94). McClear decided to terminate Carter in light of his previous instructions. He determined that she should be terminated

because of her repeated insubordinate and unprofessional behavior in taking excessive and extended breaks, her loud and belligerent response when McClear questioned her about spreading and encouraging rumors about relationships between herself and McClear and Swain, her insubordinate response when McClear questioned her about her break violations, and her admission that she intentionally tore up the May 31, 2001 Evaluation. (*Id.* ¶ 96). At the end of the meeting, McClear told Carter to leave and to call Paxton in the morning. (*Id.* ¶ 97). The next day, Carter called Paxton and he informed her that her employment at Research had been terminated. (*Id.* ¶ 98).

There are two distinct routes a plaintiff can pursue in preventing summary judgment in a retaliation claim. *See Stone v. City of Indianapolis Public Utilities Div.*, 281 F.3d 640, 644 (7th Cir. 2002). The first is unrelated to the commonly known *McDonnell Douglas* indirect method. It requires that the plaintiff present direct evidence that she engaged in a protected activity and as a result suffered an adverse employment action. However, if the defendant presents unrebutted evidence that it would have taken the employment action against the plaintiff even if it had no rertaliatory motive, the defendant is entitled to summary judgment because the plaintiff was not harmed by the retaliation. *See Stone*, 281 F.3d at 644.

The second route, as adapted to the *McDonnell Douglas* retaliation context, requires the plaintiff to show that after filing a charge only she, and not any other similarly situated employee who did not file a charge, was subjected to an adverse employment action even though she was performing her job in a satisfactory manner. *See Stone*, 281 F.3d at 644; *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002). If the plaintiff establishes these matters, the defendant may still present evidence of a noninvidious reason for the adverse action. If the defendant presents unrebutted evidence of a noninvidious reason for its action, the defendant is entitled to summary

judgment. *See Stone*, 281 F.3d at 644.

Carter has established a *prima facie* case of direct evidence of retaliation for purposes of avoiding summary judgment. Carter engaged in the protected activity of complaining about what she perceived as sexual harassment and her employment was subsequently terminated. However, Research has presented unrebutted evidence that it would have terminated Carter's employment regardless of any retaliatory motive. Carter's Infraction Log shows that Carter committed eight infractions within the first five months of being hired. These infractions included extended and excessive breaks. After the last of these infractions, stemming from Carter's violation of the company dress code, Paul was ordered to terminate Carter if she committed another infraction.

In August, Carter was brought to McClear's office because she was again taking excessive breaks and was being disruptive on the calling floor. Carter was belligerent to McClear when he questioned her about her conduct and about rumors attributed to her. Carter also admitted to intentionally tearing up the May Evaluation. Based on these undisputed facts, Research has demonstrated a legitimate nondiscriminatory reason for terminating Carter's employment.

In addition, Carter has failed to establish a *prima facie* case of retaliation via the indirect method of proof. Carter has failed to present any evidence that a similarly situated employee who did not complain of harassment received better treatment than Carter. Furthermore, as discussed above, Carter has failed to demonstrate that she was performing her job in a satisfactory manner in light of her continuing insubordination.

Assuming arguendo, that Carter had established a *prima facie* case of retaliation under this second method, her claim still fails because, as discussed above, Research has presented unrebutted

evidence of a noninvidious reason for terminating Carter's employment--her insubordination.

For the reasons stated above, Research's Motion for Summary Judgment is granted.

Dated: March 6, 2003

JOHN W. DARRAH
United States District Judge